HARRELL v. HARRELL.

4-7456                                    183 S. W. 2d 293

Opinion delivered November 13, 1944.

*Arthur L. Adams,* for appellant.

*H. M. Cooley* and *Archer Wheatley,* for appellee.

SMITH, J. Suit was brought by appellees to partition a tract of land containing 100 acres, which was owned by Eliza Modine Ashmore Markins at the time of her death, and the controlling question in the case is whether Modine, as she was called by the witnesses, died intestate.

It is undisputed that Modine executed a will, in proper form, for the primary purpose of excluding her husband, from whom she was then estranged, and from whom she was divorced in 1940, from participating in the distribution of her estate. This will devised the lands owned by Modine to her relatives of the whole blood, to the exclusion of plaintiffs, who are of the half blood. The parties are the children and descendants of J. W. Harrell, who died about 20 years ago, leaving considerable property. He was twice married, and children were born to each marriage. Appellants are heirs by the second marriage, appellees by the first.

The court found the fact to be that Modine, who departed this life on or about May 22, 1942, had during her lifetime revoked and annulled this will, that result having been accomplished by burning it in her kitchen stove. The relatives of the whole blood, who were the devisees and beneficiaries under the will, to the exclusion of the relatives of the half blood, alleged and contend that the will was not destroyed, but that it is concealed by persons whose interests are antagonistic and that Modine did not die intestate.

The will was prepared in 1938 by the late Horace Sloan, one of the state's ablest and most reputable lawyers, and what was shown to be a carbon copy thereof was found in his files after his death. According to the testimony of one Earl Swink, the will was destroyed and this was done for the purpose of revoking it. Swink was employed as a farm laborer by his brother, who was a tenant of Modine. Swink left his plow and went to Modine's house to get a drink of water, and while in the kitchen of this home Modine produced a box containing a number of papers and began looking through them. She pulled out an envelope and asked Swink to see what it was. Swink began reading it, but as he did so, Modine jerked it out of his hands and said, "I have been looking for that damn thing a long time," and went to the stove where she burned it.

Swink was subjected to a searching cross-examination, the purpose of which was to show the improbability

and falsity of the testimony, but the testimony was credited by the court and this specific finding of fact was made: "The court finds that the defendants (appellants) have failed to establish by the evidence either that any will of Eliza Modine Ashmore Markin was in existence at the date of her death, or that any will of hers was fraudulently destroyed, or was lost or mislaid either during her lifetime or after her death. The court further finds that the only will, shown by the proof to have been executed by her, was by her revoked and annulled in her lifetime."

There is no contention that Modine ever made any will except that prepared by Sloan, her attorney, and the above finding of fact, if supported by the testimony, is conclusive of this appeal. If that will was revoked, Modine died intestate, and upon that finding made by the court, partition of the lands was ordered between heirs of the whole blood and those of the half blood.

It is strongly urged that the testimony of Swink is too improbable to be believed, but the only affirmative contradiction of it is found in the testimony of one Bridges, who was also at Modine's house on the day of the alleged destruction of the will, but he was in another room of this house. He testified that Modine did not go into her bedroom and get the box from which Swink says she took the will. Bridges testified that there was a woman present from Jonesboro, with whom he spent the day in company with Modine, but he does not remember the first or last name of this woman. Bridges admitted, however, that he saw that day, for the first time, the box from which Swink says the will was taken and he saw the box that evening after Swink left, and that he did not remember ever having seen it before. There is some significance in this testimony, for the reason that Bridges was shown to have been Modine's paramour.

The attempt was made to show by Bridges that just a few days prior to the date of the alleged destruction of the will, Modine had asked him to accompany her to Jonesboro on a mission in connection with the will. This witness also testified that Modine referred to the will at

a later date and answered affirmatively the question, "Did it seem to you that she was speaking of her will as if it were still in existence?" Upon objection being made that the witness should state what Modine said, the inquiry was pursued no further. We are unable to say the chancellor should have believed the testimony of Bridges rather than that of Swink.

An attempt was made to show that Modine had deposited the will in a safety box, but no witness testified that she had ever deposited it there. When the box was opened, it was found to be empty, but there is no testimony that any person interested in destroying the will had ever had access to this box. There is an entire absence of testimony that any person who would profit by the destruction or concealment of the will ever had that opportunity. On the contrary, the testimony shows that on the day of Modine's death and soon thereafter, the premises were searched for her papers, and these were collected and carried to the home of Modine's aunt, where the body was removed.

There was testimony that friction had arisen between Modine and her relatives of the whole blood, one of these being Grandison Harrell, an uncle, who had been Modine's guardian, and who admitted that Modine told him that she was going to make him pay certain losses sustained through a bank failure. There was also a controversy with one of the relatives of the whole blood over some geese which Modine had picked up on the road near her home, and a controversy with another relative of the whole blood arose over the refusal of this relative to allow her access from her home to a state highway, and in retaliation she attempted to obstruct the road in front of her house, so that this relative could not travel from one of his farms to another.

There is a circumstance in the case which furnishes some support to the chancellor's finding that Swink's testimony was true. Swink told one Thurman that he saw Modine destroy the will, and the report of this conversation came to Mr. Sloan, who had Swink make an affidavit reciting this incident. Swink had not then dis-

cussed the matter with any person who had seen the will, and his description of that instrument lends strong support to the fact that Swink had read enough of it to know what it was and to identify it. Sloan had in his possession a carbon copy of the original will, which he had written, but he made no attempt to probate the will as having been lost or unintentionally destroyed. The cross-examination of Swink dealt at length with this affidavit, which was not offered in evidence, and it was apparently attempted to show that if Modine did destroy her will she was intoxicated and did not destroy the will with a revocatory intent, but Swink's testimony did not show this to be true.

A careful consideration of the testimony does not leave us with that assurance we would like to have in passing upon a question of fact, but does leave us with the view that the testimony does not meet the requirements of the law to restore a will which has not been produced for probate.

Section 14563 of Pope's Digest provides that: "No will of any testator shall be allowed to be proved as a lost or destroyed will, unless the same shall be proved to have been in existence at the time of the death of the testator, or be shown to have been fraudulently destroyed in the lifetime of the testator; nor unless its provisions be clearly and distinctly proved by at least two witnesses, a correct copy or draft being deemed equivalent to one witness."

Section 14560 of Pope's Digest provides that: "Whenever any will shall be lost, or destroyed by accident or design, the court of chancery shall have the same power to take proof of the execution of such will, and to establish the same, as in the case of lost deeds."

Many cases have held that this power to restore and establish either a lost or a destroyed will or deed will be exercised only upon the clearest, most conclusive and satisfactory proof, and in our opinion the testimony does not measure up to that requirement. *Nunn* v. *Lynch,* 73 Ark. 20, 83 S. W. 316; *Kenady* v. *Gilkey,* 81 Ark. 147, 98

S. W. 969; *Rawlings* v. *Berry,* 128 Ark. 273, 194 S. W. 249; *Bradway* v. *Thompson,* 139 Ark. 542, 214 S. W. 27; *Rose* v. *Hunnicutt,* 166 Ark. 134, 265 S. W. 651; *Erwin* v. *Kerrin,* 169 Ark. 183, 274 S. W. 2; *Allnut* v. *Wood,* 176 Ark. 537, 3 S. W. 2d 298; *Edwards* v. *Swilley,* 196 Ark. 633, 118 S. W. 2d 584. The decree of the court below must, therefore, be affirmed, and it is so ordered.